Good morning. We have four argued cases this morning. The first of them is number 13-1596, Sikorsky Aircraft Corporation v. United States. Before council begins, just to note that the cross-appeal here is not a proper cross-appeal in our recent decision at Roberts because it's not enlarging the judgment. The statute of limitations argument is the basis for supporting judgment in favor of the United States. So we'll only have three arguments this morning and the government should address the statute of limitations issue in the opening argument and the government will get rebuttal, but Sikorsky will not get rebuttal. Mr. Poirier, is it? How do you pronounce that? Poirier, your honor. Poirier, okay. May it please the court. The CAF board intended to regulate overhead pools and the CAF board did regulate overhead pools. Sikorsky's contention that CAF 418.50D applies only to a subset of overhead pools is silly and impossible. Moreover, there's no evidence that Sikorsky ever believed this. There's no letter to DCAA suggesting this interpretation, no internal email, not even some half-remembered water cooler conversation. I don't understand. You got plain language of D here and you seem to want to contradict the plain language of D by unpublished materials which you found in some warehouse. Why should we pay any attention to that? It's not necessary to look at the unpublished materials, your honor. First of all, I would cite that the plain language supports the government's position. The phrase activities involving direct material costs is material overhead and that's not disputed in this case. In other words, Sikorsky had I think six different activities in his disclosure statement and Sikorsky has never suggested that those activities were not activities involving direct material costs. Indeed, the first proposed rule went into great detail about the nature of material overhead costs and described the exact same activities that Sikorsky put into its disclosure statement. Let me follow up on Judge Dyke's question. When I look at D and E, it looks like there's a real pivot point between the two categories based on whether there's a material amount of management supervision costs involved in the pool. So in terms of plain language, you have to somehow answer for that very clear plain distinction that D and E are making amongst themselves. If you ask us to reverse the lower court, how would that write? Okay. I agree in part. It's a material amount of the management or supervision of activities involving direct material costs. Sikorsky would have you stop at management or supervision. That's not the whole phrase. It's management or supervision of activities involving direct material costs. That's very important because activities define the pool. If you look to the homogeneity requirement that's CAS 4-1850B, it says you have to organize your pools by activities. B3 says that you have to have all of the activities together. So in other words, it's impossible to have supervisors separated out from the other costs of the pool. Sikorsky defined the pool. They defined it in terms of five or six different activities, basically purchasing, material handling, and so forth. It is illegal under the homogeneity requirement for Sikorsky to separate out the management and supervision of those activities from the rest of the activities. That's the plain meaning of CAS 4-1850B3. All right. So how does this work? What is the de minimis requirement, the material amount? I'm still lost about the distinction between D and E. There's this whole notion of supervision and management costs. That's right. That's written right into those two subsections. Right. And so we have to answer for that particular language somehow. Exactly. What does it mean? Let me give you a good example. Occupancy costs are the cost of the heating and the air conditioning and the janitorial costs and so forth. That's a common service center pool. And it is a service center pool that's allocated to Sikorsky's material overhead pool. That's common. Here's an example. Say Sikorsky brings in a chemical that's very volatile and they have to keep it refrigerated at a certain temperature. So they have the janitorial people bring in some refrigerators and then overnight the janitorial people go by and make sure that they're all working, the temperatures are where they're supposed to be and so forth. That could be considered that those activities are activities involving direct material costs. But they're not significant. You're not addressing the plain language. You talk about something else other than the plain language. The plain language says that includes a material amount of the cost of management and supervision in order to fit under D. Yeah, but that's not all it says. It says the material amount of the management or supervision of activities involving direct material costs. In this case, it's undisputed that 100% of those costs were included in the pool. Go ahead. The one textual argument that, if I'm remembering right, you made kind of backed into is an argument about what the relevant numerators and denominators are for deciding what is material. Judge Leto and Sikorsky take the view that the denominator is the whole pool, the numerator is the relevant management supervisory costs. I'm putting aside, completely putting aside your overhead versus service sector argument. At one point in your brief, you say, no, no, no, no. The denominator is all of the supervisory and management activities. And then the question is, how much of them are in the particular pool? You say, all of them are. That can't be a material. And that intrigued me a little bit until I looked at 41840C, which makes a distinction, paragraphs one and two, exactly like D&E. They say, if A, if not A. And the not A part uses the identical language that we're using here. The A part makes it absolutely clear that it's the pool that's the denominator. Why doesn't that conclusively answer this kind of backed into argument? It's not conclusive because, first of all, the specific regulation controls the general. And secondly, they don't say that different thing if you understand what the board was getting at with materiality. In other words, Sikorsky says materiality means mostly. They don't say exactly how much, but it suggests more than half. Anyway, mostly supervisor costs. That's the nature of the pool, the managers and supervisors. That's not at all the materiality requirement in the CAS. There is a materiality regulation, and it has an elaborate regulatory history published. And they say that the materiality is not to deal with an insignificant amount of cost. They say that a couple different times, and it's at page 43, footnote 6 of our initial brief. What they're looking for is more than a tiny amount. More than a tiny amount. Because one of the consistent concerns of the CAS board throughout the 70s, in all kinds of context, is that they not make their regulations so burdensome that they would deal with some tiny amount and create great administrative expense. That's why I gave the example of the occupancy pool. Because there was a case where you can imagine a small amount of cost that are in the occupancy pool that could be considered management or supervision of direct material costs. Well, the CAS board is not out to try and make everybody change their occupancy pools into an overhead pool. But this case is not the close case. In this case, there's only a single material overhead pool. All of the costs of management or supervision are in that pool. In other words, it is exactly what the CAS board is trying to regulate. Let's assume we're running out of time here, unless my colleagues have other questions about the D issue. Let's assume you're wrong about it and that we have to look at E. What is your argument with respect to E? As I understand it, you're saying direct labor costs are not an appropriate base to allocate on and that something else should be used. What is the something else? What should they have done instead of using direct labor costs? Right. Your question poses the exact point, Your Honor, which is, if Sikorsky were right, if they were to eliminate... Now, what's the answer to my question? There is no possible way to allocate an overhead pool... Do we have no backup position as to how this should work if we conclude that it comes under E? Well, there is no other way for it to work. No. Do you have a position as to what they should have done if E applies instead of D? E cannot apply. In other words... No, no. I don't want to hear that. Let's assume we have rejected your position about that. Then there is no provision of CAS... You lose if E applies? No. There is no... Why do you win then if E applies? Because there is no provision... E cannot apply. E cannot be applied. First of all, it was not applied. You're not accepting my hypothetical. I want you to accept that E does apply, and we disagree with you. What is wrong with what they did? You say they shouldn't have used, even under E, where you go to the surrogate category, right? They should not have used direct labor costs because they haven't satisfied the proportionality test, right? What should they have done instead? What should their allocation method have been? There is no provision of CAS that will tell you. And let me explain why. There are three reasons why... Do you lose? No. Now, how do you win if E applies? Because their practice is not in compliance with any provision of CAS. In other words, they have established a practice that is not sanctioned anywhere in the category. You're simply not answering the question. Do you not have a backup argument as to what happens and why you win if E is the applicable provision? Well, I do have the answer that even if E were to be applied, they're in violation of the homogeneity requirement in CAS 41850B because they've mixed two separate pools that have different causal and beneficial relationships. So I took it you were making that homogeneity argument, which seemed to me cut across the DE. It does. And there's a separate possible answer to that. But within E, I guess I understood two things. One, that you did actually have an argument below and tried it, and Judge Leto entered a series of findings, but you don't repeat that argument. That is, there was a whole series of findings accompanied by graphs about the correlation of the direct labor cost and the material cost, which you don't repeat. I'm sorry. But you do make one argument that might be responsive to what Judge Dyke was asking you about. You didn't actually tell me about how there was a kind of a division of the pool along the way to creating this pool, and that what Judge Leto did was use a kind of hypothetical, which is not that direct labor cost was wrong, but something else. I'm not quite sure what the something else is. If I understand your question, Your Honor, which I plainly am not. In other words, the allocation from the material overhead pool, I would contend, even if you used Section E, considered it a service center, you would have to apply it when the allocation leaves the pool. And the allocation, when it left the pool, was not to a conglomerate of final cost objectives using a labor overhead pool. When the allocation left the material overhead pool, there was a two-step process, one by cost code to various places, and then the remainder... ...subsection three, right? We can't... The reason we can't... Do you agree to that? Well, I can't agree to it, Your Honor, because there is... And the CAS board found, and it's in CAS 41850B, that there is no direct and definitive relationship between the activities in a material overhead pool and the benefiting cost objectives. There is none. And E measures a direct and definitive relationship. What are you talking about? Are you saying that direct labor is not the appropriate base to allocate? What I'm saying is it doesn't measure anything. In other words, direct labor doesn't tell you how much material handling was going on. It doesn't tell you how much purchasing expense. For example, with the parts that are being purchased from Czech Republic, there's no labor associated with those parts. This is not useful. Let's go on to the statute of limitations question. Let's assume there that we reject your argument that the statute of limitations didn't begin to run until the negotiations were complete. We reject that. Okay. Sikorsky argues that pre-December 2002, the government was on notice of the method they were using, and it had an adverse effect on the government. Why are they wrong about that? The trial court found to the contrary. The trial court found that the government could not determine, even the auditor could not determine whether there was a material difference in the result of the allocation until he had received direct material cost information from Sikorsky. It was requested in August of 2002, which would be before the six-year period. But Sikorsky waited for more than a year until September 2003. They never provided the cost information for 1999 and 2000 or 2001, but they did provide information regarding 2002. So the trial court found that this information was necessary to have notice of liability, because the material difference is related to liability. And he said that even DCIA did not know until December of 2003, which is within the six-year period. So on the facts found by a preponderance by the trial court, there's no violation of the six years, even under the accrual theory that Sikorsky advocated and the trial court accepted. Can I ask you, I take it you did not make an argument along the following lines, that even if you were out of time for any harm that might have occurred in 2002, the continuing claims doctrine or something else allowed you to pursue the vast bulk of your claims for 2003, 2004, 2005. I don't care about the label. Why is a series of year-by-year, payment-by-payment injuries not separately actionable, one-by-one? It's not the way the CAF regulations require you to calculate the damages. In other words, they don't do – the impact is not – they're not all cost reimbursement contracts, and the impact is not calculated year-by-year. Okay, and can I just ask one other question? There was some reference, I think, including in Judge Leto's opinion, about possible netting of benefits to the government against possible losses to the government. And can you – I'm confused about – I'm not understanding how, as to fixed-price contracts, where you're paying the same amount regardless of their accounting, how there's anything to net. It could be a benefit, but not actually sort of a positive number that could be netted against a loss on another contract. Are there some non-fixed-price contracts in which this – the challenged accounting method actually produced lower payments from the government that could be netted out? What the top quote was talking about was a cost-impact calculation that's, of course, be provided. But the problem with that cost-impact calculation for use in terms of any kind of notice to us is that it combined an analysis of two different changes, a change to their G&A calculation and a change to their overhead calculation. There's no way to tell from those numbers how much was related to G&A and how much is related to overhead. So in other words, the trial court did reject that cost-impact calculation as giving us notice of the impact of the change, and he did get into some of that netting stuff. I didn't follow it all entirely. But the bigger issue is that it doesn't separate out the impact of this particular change, so it can't give us notice of what happened because of this change. But are the contracts here all cost-plus contracts, or are some of them fixed-price contracts? I think most of them are fixed-price. But anyway, it is a mix. How is it that using the wrong overhead impacts the fixed-price contracts? Is that because you go back and reprice them because they allegedly used the wrong cost accounting methodology? No, it's because there's contracts coming in on a rolling basis, Your Honor. In other words, there's new contracts. As they come in, their advanced price proposals are going to reflect the current practice. That's why I think Sequoia— If we're talking about future contracts, how does that adversely impact the government? You may have a dispute as to how these future contracts should be priced, but why is that the basis for a government recovery? I don't understand. Well, what Sikorsky said to the government in 1999 is, for the first couple of years, there's not going to be any impact to the government with this new accounting change because you already have all these fixed-price contracts that have already been priced. And so the government sort of accepted that. But as things came along, by using the labor rate, it shifts, in this case, we believe, about $65 million over the entire period. In other words, from 1999 to— Is the government seeking to recover amounts back on fixed-price contracts as a result of the use of what you regard as an improper accounting approach? Yes. And is it seeking to recover amounts back under cost-plus contracts? Yes. So it's both. It is, Your Honor. Okay. All right. Thank you. We'll give you two minutes for rebuttal. Thank you, Your Honor. May it please the Court, Jeff Hall for Sikorsky. Your Honors, on CAS 418, I hope to show three things. First, that the trial court correctly determined that 50E applied here. Let's assume for the moment that E applies, okay? And as I understand it, everybody agrees that if E applies, that brings you to subsection 3. Yes. Correct? Yes. And it has to be using a surrogate that varies in proportion to the services received. And you say, well, direct labor is an appropriate base because we look historically to the administration costs relating to material, and that seems to have a relationship over the years to direct labor, correct? Generally, yes. Okay. But I fail to understand how that proves compliance with subsection C because the relationship between direct labor and material administration costs could just be fortuitous. It doesn't necessarily show that it's cause and effect. How do you answer that? Two ways, Your Honor. First, 40C2 sheds light on what a surrogate base is, which is what we're addressing here under E. And it says it is a base that is representative of resources consumed. So the question is, was direct labor during this period representative of material overhead resources? The trial court heard qualitative and quantitative evidence concerning the relationship between direct labor and material overhead. Material overhead served essentially as a service organization for direct labor. This is the evidence the trial court heard and found. It purchased the materials to be used by the direct labor force, engaged in all the logistics, receiving, moving them around to prepare them for use in the assembly and manufacturing process. I understand that, but what was the evidence, and I don't think I saw this in the briefs, but what was the evidence showing that there was a relationship other than this historical, perhaps coincidental relationship? Well, it goes to the qualitative evidence about how material overhead, and it's called material overhead. It's related to material. There's no doubt it involves buying and moving material, but the qualitative evidence showed that it was very much related to labor. And the other evidence that showed that there was just this relationship, and not just a coincidence, concerned the outsourcing. The outsourcing that Sikorsky engaged in on the commercial side. They bought more direct material, yet material overhead remained relatively flat, so did direct labor. There was a reason for that. While direct material goes up, for the government aircraft where direct labor was still substantially involved and not affected by outsourcing, material overhead remained flat and so did direct labor. And it was more than a coincidence. The qualitative evidence the court relied on showed that there was very much an interrelationship between material overhead. The court heard evidence about how essentially the material overhead workers were preparing and presenting the material for the direct labor force. And so they were really a service organization for direct labor. So this was more than a mere coincidence, Your Honor. And by the way, the same record evidence shows both qualitatively and quantitatively that direct labor was an appropriate base under 50D. And I know that's not where the court seems to be heading, but 50D requires a representative base. So it's interesting that CAS 418 with respect to the surrogate base under E and the representative base under D speaks in terms of representative. And there was abundant evidence about how direct labor during this period at Sikorsky was representative of material overhead. Now what do you understand the government's position to have been as to what you should have done under E? Unclear. I think there have been suggestions that were introduced, some for the first time at one, for the first time at trial, was that Sikorsky should have developed two pools here. One for GFM related material overhead and allocated that under E. At least that's what their auditor had said. And a second pool that's non-GFM material overhead. And the government, I don't think, said that could be allocated under E. But that suggestion was raised for the first time at trial and was refuted by the evidence that shows these costs couldn't be feasibly distributed that way and divided that way. Neither did they argue that you should have continued to use the method that you used, I guess it was before 1999, and the method that you are currently using? Well, I think the government under 50E never claimed we violated 50E. There was never any claim in the contracting officer's decision. And I don't think there was a presentation at trial and I haven't seen an appellate argument about how 50E would apply here. What they said throughout the case is that a direct material base was required here. No ifs, ands, or buts was required here. A direct material base which wouldn't include government furnished property. That's right. And would cause distortions. There's undisputed evidence, much of it from the government witnesses, that it would produce unreasonable distorted allocations fundamentally at odds with CAS 418. And before 1999 we did not use a direct material base, at least as the government argued we should now. You used direct material base but excluding engines? Yes, and excluding certain other used aircraft. But it was to address, an attempt to address the GFM problem. But I guess my only point is, I didn't hear the government taking that position in this case. It said here we were required to use direct material, period. And I'll advise the court, and this is in Judge Leto's opinion, that after 2005, with the government's approval, we have used a different method. But it too is not direct material cost allocating all these expenses. In fact, it involves a portion allocated over direct labor. So the government's position in the litigation is different than it was before and after this period. But frankly, they've never contended, they didn't claim we violated 50E, and I have not heard an argument about how 50E applies, either before today or today. Since 2005, are you using some kind of hybrid between direct labor and direct material? With agreement from the government, we entered into a new approach where we divided the pool between material handling on one hand, and then all the other, which is mostly purchasing related, but some other material overhead on the other hand. The material handling continues to be allocated on a direct labor base, approved by the government. The remainder of the costs are allocated on a hybrid base. It's another effort to deal with this GFM and outsourcing distortion problem at Sikorsky. And frankly, the government in this case, for this period, has offered no solution to that. And when you use a method that distorts allocations, that's fundamentally at odds with CAS 418's requirement that they be in reasonable proportion to the causal beneficial relationship. I want to address one interpretation question that Your Honor raised concerning the numerator and the denominator, because that was an argument that was not – it was raised in the trial court, but it was not developed – Judge Letow said, here's how I interpret it, and they came back and said, well, if you interpret it this way, then all the costs are – and he said, that's not what I meant. I meant this. Correct. And I think it's answered in the first instance by D versus E, but to the extent there is a shred of a possibility of interpretation, it is fundamentally reputed by the very provision you identified, which is 40C1. And it makes crystal clear that the question is, does the pool include a material amount of these costs? Is a material portion of the pool these management and supervision costs? And that fits with the rationale. The rationale is, if a pool includes a material amount of these costs, it is going to tend to be more distantly related from a causal beneficial standpoint. Whereas the interpretation that the numerator is these management and supervision costs that are in the pool and the denominator is all of these management and supervision costs related to these activities would have no rationale. If that were really the rule, if you had $100 of those costs and all $100 were in this pool and it's a $100 million pool, that would determine the outcome, and there's really no rationale for that. But in any event, 40C1, I just wanted to emphasize our position, and the trial court, I think, did see this. 40C1 just flatly reputes it. With respect to the question… I'd ask you to turn to the limitations issue. And let's assume here, as we did with the government, that their argument that the statute of limitations should run from the impasse and the negotiations is rejected. And the question is, did the government have notice of the method that you were using and the adverse impact of that method within the six-year period? Would the court also like to hear argument on the jurisdictional issue or go straight to the accrual? Which jurisdictional issue? That is, that a timely claim is a jurisdictional requirement of the government's claim under the CDA. Well, no. Let's just go to the… All right. My colleagues want to ask questions about that. So I'll go straight to the accrual issue, the actual accrual issue. The trial court made the findings and then overlooked one key fact. That's how we see it here. There's no question that starting in 1999, actually in 1998, when we gave notice to the government, the government took the position that KS-418 did not authorize a direct labor base. They knew what you were doing. They absolutely knew what we were doing, and they expressed their concern that they didn't think that was authorized. And the question really comes down to when was there an impact, a significant impact such that they had notice of a claim. Now… They have to have notice of the impact, right? It's not sufficient that there is an impact. They actually have to know that there's an impact, right? They have to know or should have known. It is an objective test. Yes, Your Honor. And the government's position is that its auditor didn't have enough information to make the kind of calculation he thought he needed to make to develop a cost impact estimate. But that's not the standard. The standard is, and in fact, a some certain need not be calculated. Right, but there's a big difference between those two things, right? Some certain is one thing, not even knowing if the number is zero or something positive is another thing. True, and their auditor knew very well that it was not zero. He knew because he made estimates. He didn't make… Substitute for zero whatever the number is that constitutes too insignificant to care about. Well, that's right. But he, their auditor knew that beginning in 2001, he made numerous estimates that they were going to be multimillion dollar impacts starting in 2001. He repeated that estimate even in 2002. I thought that there was some, I guess, this was just confusing to me. I thought that the action here on this had something to do with a question about how they could count the impact. So that an impact on one contract or even one portion of a contract might be in some way neutralized by other things. And the only thing that would give them a knowledge of an injury, an actionable injury, would be something more global than some isolated impact. In this case, they knew that the great bulk, and it's in the range of something like 90% of the contracts that issued in this period are firm fixed price contracts. And the other 10% are cost plus kinds of contracts. And the firm fixed price contracts were going to receive increased costs due to this method. How would that happen? Just explain how this change in accounting method would affect the fixed price contract. Is there a provision in the fixed price contract that if there's an error in cost allocation that that's going to affect the amount that the government has to pay? Well, two things. It would be impacted contracts that were signed after 99 because they would be priced using that method. And if they were improperly priced, then the government can recover money back? Generally true. Yes, generally true. And that's generally the theory as I understand it here for why they were harmed under these fixed price contracts. And what the trial court overlooked was the trial court found in 2002 they had made estimates. And by the way, these estimates were that there were increasing costs shifting to the government. We're not surprised. Sikorsky had told them in 98 and 99, this is an effort to address this GFM distortion, which our hybrid method is only partially mitigating. So it was not a surprise to the government. The fact that the government knew that doesn't suggest that the use of a different method was going to cost the government money. In this circumstance, I think it does, Your Honor, because we told them we are underallocating to government contracts as a result of this GFM distortion. The zero value. Where do we find that? Where was the government told that there was an underallocation to the government contracts as a result of this? There was a letter in June 1998. Can you show us where in the record this is? I will look for that, Your Honor. I thought in 99 the contracting officer said there's possible noncompliance, but not now. Things are fine now. But in the future, we could potentially see noncompliance. And so we ought to continue monitoring the situation. And can you, Sikorsky, give us some kind of cost impact proposal, which you did in 2000. And in that cost impact proposal, you stated to the government that there would be a net benefit to the government using this new accounting process through 2003. And the reason it was a net benefit was increasing costs were being shifted to the government. But under these firm fixed price contracts that had been entered before 1999, the government wouldn't have to pay those. And so that showed a net benefit. But what the trial court overlooked was in late 2002, the multi-year six contract was entered into. And actually from 99 through 2002, a number of contracts were entered into priced under this method. And the multi-year six contract is the great bulk of this claim for this period. The multi-year six contract entered in 2002. According to the government's cost impacts is 50% or more, according to their estimate, I believe. It's certainly substantial. But the trial court said when costs are entered into after 2002, then the government would know of this impact. But it overlooked that the biggest contract here, which is a representative contract in the case, was signed in the summer of 2002. And the government had already been making payments and therefore already presumably suffered alleged injury under its theory. But the question is how did the government know that it was suffering injury as a result of this change in accounting method? You said there was some letter that was sent to the contracting officer that said this is going to cost you money. I'd like to see that if there is such a thing. There is a letter in June 1999 or June 1998 that I'll locate, Your Honor, that Mr. Boyer himself knew. And there were notes he made and conversations he had and his testimony shows he knew there would be an impact. And he estimated it was going to be, beginning in 2001, $8 to $11 million. We cite those testimonies and notes in our brief. So Mr. Boyer was making estimates. He had information sufficient to make estimates. And those were estimates of this change, not a combined change. I thought Judge Chen was pointing out here, maybe I misunderstood, that you went back and said, oh no, there's a net benefit. But the net benefit, and this has to do with the terminology and the regulations, the net benefit told the government increasing costs were being allocated to government contracts. That's what the net benefit showed. But the government knew that for contracts entered into after January... Net benefit from allocating costs to government contracts? Because they were mostly fixed contracts signed before January 1, 1999. So they didn't have to pay. That's right. That's right. That's the shorthand. And they call it a net benefit. And then in the government-owned bookkeeping, they count that, right, as a benefit? I don't know in all circumstances I can answer that, Your Honor. But the point I'm trying to make, and I don't think I've made it clear, is that that told the government for contracts entered into after January 1, 1999, there would not be a net benefit. Okay, but that's the question. There's a risk here that it's in your interest to befuddle the situation and not to be clear with the government that this change in the accounting approach was going to result in costs to the government. That's the risk. And so the statute of limitations only runs when you either told the government or the government should have known that this was going to cost them additional money. And I think what we're struggling with is to find either an explicit statement or some other reason that the government should have known that this would result in increased costs. Well, there was a June 1998 or 1999 letter that we sent to the government, and we said, we're doing this. It's going to cost more because we're addressing the GFM problem. And it's not going to cost as much as another alternative that we had considered. And I'm sorry that I don't have the record site for the court at this moment, but I think Mr. Isn't it true, though, that in response to all of this, the contracting officer, after receiving the auditor's reports, concluded that there was no noncompliance at the present time of changing over to the new accounting practice. There's possible noncompliance going into the future, and it's something that the government ought to and needs to continue to monitor in the out years. That was basically her position at the time. Yes, it was. After taking in all of your information, after taking in all the information from the auditors. Yes, and our response to that was, that's because in 1999 and 2000, as these contracts were so slowly changing over and we were signing new contracts that would be priced under this method, they were still dominated by the past contracts. But they told the government that as time progressed, and according to Mr. Boyer, the auditor, starting in 2001, these were going to be big numbers. And that's essentially our point here, but you have it right on the facts in 1999 and 2000. And I take it it's a JA4103, the letter that you're referring to. It's confidential, so we can't discuss it, but that's June 1999. I think that's what you cite in your grade reading at the very bottom of page 14. That is the right data. I appreciate the court's pointing that out. I do want to mention one point concerning the statute of limitations. It goes to a question Judge Taranto asked, and that is concerning the continuing claim doctrine, because I want to be clear about our position. And I don't know that that's the right label, but I do want to make sure the court understands that with respect to the statute of limitations, as stated in our complaint, our position here is that it is a bar as to claims based on contracts signed before December 2002. And in this case, that is the great bulk of the alleged damages, but it is not all of them. And I want to be candid with the court and make sure I express that. So your limitations argument would not bar every dollar of their claim? That is our position, Your Honor, and your question raised that. And again, essentially I'm not making an argument about the continuing claims. I'm being agnostic. I just want to say that's our position in this case. Can I just ask you, what turns on whether this six-year presentation requirement is jurisdictional or not? Obviously, nothing of the nature of can you raise it late in the proceeding because you didn't raise it in a timely fashion. Jurisdictional arguments you tend to be able to raise any time, but that's not an issue here. So what aspect of the analysis is affected by whether this rule is jurisdictional or not? Well, it shifts the burden because if it is jurisdictional, as we contend that it is, the claimant has the burden of proving timeliness. That has been the ASPCA's holding in this context. I recognize this court has not yet ruled on the jurisdictional question in the context of a government claim under the statute of limitations. But it would shift the burden. We contend that the record is sufficient with or without the burden on the statute of limitations. And the trial court overlooked the one significant fact, that is that substantial contracts were already in place before December 2002 priced under this method. But if the court disagrees, then the trial court should apply, determine the facts in light of the correct burden. So that's how I understand the court's question. That's our position on that. I want to go back to 4103. First of all, why is this document marked confidential? What is confidential about this document? That document includes certain cost data of Sikorsky. All right, well, you know, you shouldn't be marking an entire document as confidential just because it has some cost data. You can delete the cost data. Show me where in this document, the non-confidential part of it that doesn't disclose the actual cost data, where is it that you tell the government that this is going to cost them more money? Sorry, Your Honor, I can't locate that. If it's the letter, I don't know. You don't have it? If it has the $1.7 million estimate. You don't have the appendix with you? We do electronically, Your Honor.  I apologize. I apologize. In that letter, or another June letter, we advised, I believe it's that letter, we advised that under this method, applied back to 1998, we estimated a $1.7 million impact. Had that been applied? We were telling the government that this was a means by which increased costs were going to be allocated to government contracts. I believe the record is abundantly clear the government understood that. That was a driving force for them to There's this sentence that says the increase using the material operations intermediate pool is, and then it gives the number, which is more than a modified 1998 material overhead rate, but less than a full 1998 material overhead rate. Is that the Yes, yes. How does that tell the government that the net cost is going to be greater? It tells the government that increased costs are being allocated, not as much as another alternative that we had discussed with the government. The government knew very well that we were concerned about the underallocation of these costs due to the GFM distortion. Mr. Boyer recognized that. That was part of a driving reason why he was opposed to this, because he thought it, number one, didn't comply, and number two, would have a significant cost impact. If these costs were not going to impact the government, Mr. Boyer would not have been complaining. Okay, any more? Thank you, Mr. Hall. Thank you. We'll give you three minutes since we went on a bit there with Mr. Hall. Thank you, Your Honor. Your Honor, at page 4171 of the joint appendix, as late as February 2007, Sikorsky was still telling the government in writing that there was no cost impact. Where does it say that on that page? Okay. If you look in the first paragraph from Mr. Chantio, he was the manager at Sikorsky, and then if you look to the next to the last sentence, it says, as a case in point, the reason we have asked for a desirable change determination is because in the aggregate, the U.S. government contracts negotiated after 1999 would have resulted in a higher cost with the material overhead. So, again, no basis for the noncompliance. No basis for the noncompliance, because there's no material impact. Sikorsky said the same thing in October of 2004 when DCAA issued its audit report. In the letter attached to the back of the audit report, Sikorsky said, you have not proved any material impact. And the auditor agreed that he had not been able to prove a material impact. He had suggestions, but he had been unable to complete the cost impact because there had been changes in Sikorsky's business. The bottom line is this. The reason why the auditor had so much trouble trying to calculate a cost impact is in order to show what the allocation would be with direct material costs, he had to know what the direct material costs were. But after 1999, Sikorsky no longer routinely recorded that. In the old days, they used to put it right into the NAVAIR report. But after 1999, they no longer reported it. And when the auditor asked for that information, Sikorsky never provided it for 2000 and 2001. And they took more than a year to provide it, even though it only took them one week to gather it. Those are the facts that the trial court relied upon. He didn't say Sikorsky's hiding the ball, but it was quite plain from his recitation of what happened. Sikorsky was not coming forward. And that's the reason why I think, for the reasons we put forth in our brief, that the accrual method required by statute makes more sense, because it doesn't allow a contractor to say, there's no impact, there's no impact, oops, there's an impact that you should have known long ago. That's the current status of the case. Briefly, with regard, I just want to make one point clear because it's important. If the trial court is affirmed, there is no longer any cast for 1850-D. There is no longer a provision that expressly applies to all rules. If the interpretation is something that's undesirable, the board can change the regulations, right? According to the precedent of this court, Your Honor, an interpretation that would manifestly result in an impossible application is not a reasonable application. It's true that the board can change the standards if the interpretation is not what they intend. But, Your Honor, if the United States were to get rid of the Fourth Amendment by judicial decision, the United States can reenact the Fourth Amendment. It's not always as easily done. The CAS is a system of regulations put together in the 70s by a body with dozens of staff working intensely over the years with industry, and they made a network of regulations. If you pull that apart, it's not easy to put it back together. The current CAS board has one staffer, and they deal with certain things, they do some revisions. They're not in the process of totally revamping the CAS. Furthermore, there's no need to. In our system, we should build on the laws that exist. If the court finds that CAS 41850-D is ambiguous, there's regulatory history, and the regulatory history is overwhelming. Okay, I think we're out of time now. Thank you very much. Thank you both, counsel. Thank you, Your Honor.